**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **RICHARD WAWRZENIAK**, individually and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**INDICO DATA SOLUTIONS, INC.,**<br><br>Defendant. | Case No<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Richard Wawrzeniak ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant, Indico Data Solutions, Inc., ("Indico" or "Defendant") to obtain damages, restitution, and injunctive relief from Defendant. Plaintiff makes the following allegations upon information and belief, except as to his own actions, the investigation of counsel, and facts that are a matter of public record.

## NATURE OF THE ACTION

1. This class action arises out of Defendant Indico's failures to properly secure, safeguard, encrypt, and/or timely and adequately destroy Plaintiff's and Class Members' (defined below) sensitive personally identifiable information that it had acquired and stored for its business purposes.

2. According to its website, Defendant "modernizes insurance operations by automating the ingestion and orchestration of underwriting, claims and servicing work, delivering downstream-ready data"[1] "designed to handle real insurance work in production, at scale, across

[1] https://indicodata.ai/ (last visited September 8, 2026).

underwriting, claims, and servicing."[2]

3. Indico's customers include major insurance carriers, reinsurers, and financial institutions that use its intelligent intake and orchestration platform. Accordingly, this data breach is a "hub-and-spoke" type in which Defendant, the "hub," processes and maintains data for numerous clients, the "spokes."

4. According to the HIPAA Journal, Indico exposed the personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") belonging to Plaintiff and several million other Class members (the "Data Breach").[3]

5. Indico confirmed the Data Breach on May 7, 2026, but was unaware of "when the incident was detected or for how long unauthorized individuals had access to its systems."[4]

6. The "Notice of Data Incident" Plaintiff received states only that "Indico recently experienced a data security incident that may have impacted some of your personal information. Indico is a vendor that provides data ingestion and workflow organization services to companies in various industries and would have your information if provided by a customer."[5] Further that "[o]n August 3, 2026, we determined that some of your personal information was present in documents stored in the online repositories" including "your name, Social Security Number, Account Number and Institution Name."[6]

7. Due to Defendant's data security failures which resulted in the Data Breach,

---

[2] *Id.*
[3] https://www.hipaajournal.com/nfi-north-nephrology-associates-data-breaches/ (last visited September 8, 2026).
[4] *Id.*
[5] https://www.mass.gov/doc/2026-1472-indico-data-solutions/download (last visited September 8, 2026). *See also* Exhibit "A."
[6] *Id.*

cybercriminals were able to target Defendant's computer systems and exfiltrate highly sensitive Private Information belonging to Plaintiff and Class Members including names, addresses, phone numbers, email addresses, dates of birth, Social Security numbers, and medical information such as health insurance information and treatment information.

8. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect Plaintiff's and Class Members' Private Information with which it was entrusted.

9. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that network in a dangerous condition.

10. Plaintiff brings this class action lawsuit on behalf of himself and all other similarly situated persons to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access of a known third party and failing to include precisely what specific types of information were accessed and taken by cybercriminals.

11. Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members with prompt and

full notice of the Data Breach.

12. In addition, Defendant failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant properly monitored its computer network and systems, it would have discovered the massive intrusion sooner rather than allowing cybercriminals almost two weeks of unimpeded access to Plaintiff's and Class Members' PII and PHI.

13. Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

14. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including: opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

15. Plaintiff and Class Members may also incur out of pocket costs for, *e.g.*, purchasing credit monitoring, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

16. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring funded by Defendant.

## PARTIES

17. Plaintiff Richard Wawrzeniak is and at all times mentioned herein was an individual citizen of the State of Maryland. On or about August 27, 2026, Plaintiff Wawrzeniak received notice that his Private Information was exposed as a result of the Data Breach. *See* Exhibit "A." Prior to receiving that notice, he had no idea that his Private Information had been compromised.

18. Defendant Indico Data Solutions, Inc. is a Delaware corporation registered to conduct business in this state with its principal place of business at 77 Sleeper Street, PMB 02-109, Boston, Massachusetts, 02210.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d). The amount in controversy in this Class action exceeds $5,000,000, exclusive of interest and costs, and there are numerous Class members who are citizens of states other than Defendant's state of citizenship.

20. This Court has personal jurisdiction over the parties in this case. Defendant Indico conducts business in this District and is a citizen of this District by virtue of having its principal place of business located in this District.

21. Venue is proper in this District under 28 U.S.C. §1391(b) because Indico maintains a headquarters in this District and regularly conducts business in this District.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

22. Defendant Indico represents that its "Intake and Orchestration Platform is built to meet the security, reliability, and integration demands of modern insurance enterprises.

Designed to fit cleanly into complex technology ecosystems, it protects sensitive data, simplifies enterprise GRC initiatives, and ensures your operational workflows execute with total transparency, control, and resilience."[7]

23. In its ordinary course of business, Defendant requires its corporate customers to provide Defendant with each client's (and Plaintiff did provide) sensitive, personal, and private information, such as their:

- Name, address, phone number, and email address;
- Date of birth;
- Social Security number;
- Marital status;
- Demographic information;
- Information relating to the individual's medical and medical history; and
- Insurance information and coverage.

24. Upon information and belief, Defendant's website represents that its platform "Delivers the security and compliance that enterprise insurers need."[8]

25. Defendant agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act ("HIPAA").

26. Yet, through its failure to properly secure Plaintiff's and Class Members' Private Information, Defendant failed to meet its own promises of data security.

---

[7] https://indicodata.ai/architecture/ (last visited September 8, 2026).
[8] https://indicodata.ai/architecture/ (last visited September 8, 2026).

27. The Private Information Defendant held in its computer system and network included Plaintiff's and Class Members' highly sensitive Private Information.

***The Data Breach***

28. A data breach occurs when cybercriminals intend to access and steal Private Information that has not been adequately secured by a business entity like Defendant.

29. Prior to and through May 2026, Defendant stored Plaintiff's and Class Members' unencrypted PII and PHI in an Internet-accessible environment on Defendant's network.

30. According to cybernews sources, "a cybersecurity incident was confirmed by Indico Data Solutions on May 7, 2026."[9]

31. Defendant indicates there was a hacking incident and it "determined that it had suffered a cybersecurity incident which may have involved unauthorized access to various online repositories containing customer information. We immediately implemented our incident response protocols, took steps to secure our environment, and worked with external cybersecurity specialists to investigate. On August 3, 2026, we determined *that some of your personal information was present in documents stored in the online repositories.*"[10]

32. Presently, however, Defendant has provided no public information on the ransom demand or payment.

33. In January 2023, three years before the attack, HHS created a presentation specifically for healthcare providers and IT departments, warning entities like Defendant of the severe threats posed by cybercriminal groups.[11] Within the insurance industry, the risk of a cyberattack is well-known and preventable with adequate security systems in place.

---

[9] *See* nn.3, 5, *supra*.
[10] *Id*.
[11] https://www.hhs.gov/sites/default/files/royal-blackcat-ransomware-tlpclear.pdf (last visited September 8, 2026).

34. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

35. Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

36. Defendant had obligations created by FTCA, HIPAA, contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

37. Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

***The Data Breach was a Foreseeable Risk of which Defendant was on Notice.***

38. It is well known that PII and PHI, including Social Security numbers in particular, is a valuable commodity and a frequent, intentional target of cybercriminals. Companies that collect such information, including Defendant, are well-aware of the risk of being targeted by cybercriminals.

39. Individuals place a high value on the privacy of their PII and PHI. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

40. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any

losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[12]

41. Individuals, like Plaintiff and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing one's DNA for hacker's purposes.

42. Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse.

43. The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[13]

44. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

---

[12] "Victims of Identity Theft, 2018," U.S. Department of Justice (April 2021, NCJ 256085) available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited September 8, 2026).

[13] https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited September 8, 2026).

45. According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data." [14] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[15]

46. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII and PHI private and secure, Defendant failed to take appropriate steps to protect the PII and PHI of Plaintiff and the proposed Class from being compromised.

47. Defendant's data security obligations were particularly important given the substantial increase in data breaches in the industry preceding the date of the breach.

48. According to an article in the HIPAA Journal posted on January 10, 2026, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[16]

[14] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last visited September 8, 2026).
[15] *Id.*
[16] https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last visited September 8, 2026).

49. More than 144 million Americans' medical information was stolen or exposed during 2024.[17] This fact represents the continuation of record-breaking health care data breaches in the last several years. In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[18]

50. The HIPAA Journal article goes on to explain that patient records, like those stolen from Defendant, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[19]

51. Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

52. HHS data shows more than 39 million patients' information was exposed in the first half of 2023 in nearly 300 incidents and that healthcare breaches have doubled between 2020 and 2023, according to records compiled from HHS data by Health IT Security.[20]

53. According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical

---

[17] https://www.statnews.com/2024/12/05/change-healthcare-cyberattack-2024-record-year-us-data-breaches/ (last visited September 8, 2026).
[18] https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last visited September 8, 2026).
[19] *Id.*
[20] https://healthitsecurity.com/features/biggest-healthcare-data-breaches-reported-this-year-so-far (last visited September 8, 2026).

record for up to $1,000."[21]

54. The significant increase in attacks in the industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendant.

***Defendant Failed to Comply with FTC Guidelines.***

55. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

56. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[22] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[23]

57. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity

---

[21] https://www.ahu.edu/blog/data-security-in-healthcare (last visited September 8, 2026).
[22] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited September 8, 2026).
[23] *Id*.

on the network; and verify that third-party service providers have implemented reasonable security measures.

58. The FTC has brought enforcement actions against businesses, like that of Defendant, for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

59. Defendant failed to properly implement basic data security practices.

60. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

61. Defendant was at all times fully aware of its obligation to protect the PII and PHI of its patients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***Defendant Failed to Comply with Industry Standards.***

62. As shown above, experts studying cyber security routinely identify providers such as Defendant as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

63. Several best practices have been identified that a minimum should be implemented by providers like Defendant, including but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication;

protecting backup data, and; limiting which employees can access sensitive data.

64. Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

65. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

66. These frameworks are existing and applicable industry standards in the industry, yet Defendant failed to comply with these accepted standards, thereby opening the door to and failing to thwart the Data Breach.

***Defendant's Conduct Violates HIPAA.***

67. HIPAA requires covered entities such as Defendant to protect against reasonably anticipated threats to the security of sensitive patient health information (PHI).

68. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

69. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the

Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

70. A Data Breach, such as the one Defendant experienced, is considered a breach under the HIPAA rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40.

71. Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate its failure to comply with safeguards mandated by HIPAA.

***Defendant Breached its Obligations to Plaintiff and Class.***

72. Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its patients' data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect patients' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that vendors with access to Defendant's protected health data employed reasonable security procedures;

e. Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

f. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

l. Failing to train all members of Defendant's workforce effectively on the policies and procedures regarding data security, as well as PHI, as necessary and appropriate for the members of its workforces to carry out their functions

and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

m. Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR 164.304 definition of encryption).

73. As the result of maintaining its computer systems in manner that required security upgrades, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

74. Accordingly, as outlined below, Plaintiff and Class Members now face an increased risk of fraud and identity theft.

***Data Breaches Put Consumers at an Increased Risk Of Fraud and Identity Theft***

75. Data Breaches such as the one Plaintiff and Class Members experienced cause significant disruption to the overall daily lives of victims affected by the attack.

76. In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[24] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps Data Breach

[24] https://www.gao.gov/assets/gao-19-230.pdf (last visited September 8, 2026).

victims (like Plaintiff and Class) must take after a breach like Defendant's are both time consuming and of only limited and short-term effectiveness.

77. The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

78. The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[25]

79. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

80. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

81. Theft of Private Information is also gravely serious. PII/PHI is valuable property.[26]

82. It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to GAO:

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a

[25] *See* https://www.identitytheft.gov/Steps (last visited September 8, 2026).

[26] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

> year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report, at p. 29.

83. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

84. There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. This is evidenced by the fraud that has already taken place in Plaintiff Wawrzeniak's case, as discussed in further detail below. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

85. As the HHS warns, "PHI can be exceptionally valuable when stolen and sold on a black market, as it often is. PHI, once acquired by an unauthorized individual, can be exploited via extortion, fraud, identity theft and data laundering. At least one study has identified the value of a PHI record at $1000 each."[27]

86. Furthermore, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[28] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for

---

[27] https://www.hhs.gov/sites/default/files/cost-analysis-of-healthcare-sector-data-breaches.pdf at 2 (citations omitted) (last visited September 8, 2026).

[28] *Identity Theft and Your Social Security Number*, Social Security Administration (last visited September 8, 2026 ). (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited September 8, 2026).

unemployment benefits, or apply for a job using a false identity.[29] Each of these fraudulent activities is difficult to detect. An individual may not know that his or his Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

87. Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[30]

88. This data, as one would expect, commands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[31]

89. In recent years, the medical and financial industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

---

[29] *Id.* at 4.

[30] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited September 8, 2026 ).

[31] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited September 8, 2026 ).

## PLAINTIFF'S EXPERIENCES

***Plaintiff Richard Wawrzeniak***

90. Plaintiff Wawrzeniak is and was a client of one of Defendant's corporate customers at all times relevant to this Complaint.

91. Since the Data Breach, Plaintiff Wawrzeniak has tried to mitigate the damage by changing his passwords, contacting the credit bureaus as Defendant instructed, and monitoring his financial accounts for about 2 and a half hours per week. This is more time than he spent prior to learning of the Defendant's Data Breach. Having to do this every week not only wastes his time as a result of Defendant's negligence, but it also causes him great anxiety.

92. Soon after the Data Breach, Plaintiff Wawrzeniak began receiving an excessive number of spam calls on the same cell phone number provided to Defendant on his records. These calls are a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, he believes that the calls are related to his stolen PII.

93. Plaintiff Wawrzeniak is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

94. Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties and possibly criminals. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

95. Plaintiff has experienced anxiety and increased concerns arising from the fact that his PII has been or will be misused and from the loss of his privacy.

96. The risk is not hypothetical. Here, a known hacking group intentionally stole the data, misused it, threatened to publish, or has published it on the Dark Web, and the sensitive

information, including names and Social Security numbers, is the type that could be used to perpetrate identity theft or fraud.

97. Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's PII—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and because of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such services will include future costs and expenses.

98. Plaintiff has a continuing interest in ensuring that his PII which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

99. Had Plaintiff Wawrzeniak been aware that Defendant's computer systems were not secure, he would not have entrusted Defendant with his PII and PHI.

## PLAINTIFF'S AND CLASS MEMBERS' COMMON INJURIES

100. To date, Defendant has done absolutely nothing to compensate Plaintiff and Class Members for the damages they sustained in the Data Breach.

101. Defendant offered only two years of credit monitoring to class members.

102. Defendant fails to offer any compensation to victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' Private Information, out of pocket costs, and the time they are required to spend attempting to mitigate their injuries.

103. Furthermore, Defendant's failure to safeguard Plaintiff's and Class Members' Private Information, places the burden squarely on Plaintiff and the Class, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts and omissions

resulting in the Data Breach. Defendant merely sent instructions to Plaintiff and Class Members about actions they can affirmatively take to protect themselves.

104. Plaintiff and Class Members have been damaged by the compromise and exfiltration, by cyber-criminals, of their Private Information as a result of the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

105. Plaintiff and Class Members were damaged in that their Private Information is now in the hands of cybercriminals being sold and potentially for sale for years into the future.

106. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft, especially in light of the actual fraudulent misuse of the Private Information that has already taken place, as alleged herein.

107. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

108. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

109. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

110. Plaintiff and Class Members also suffered a loss of value of their Private

Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

111. Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

112. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Monitoring their medical records for fraudulent charges and data;

e. Addressing their inability to withdraw funds linked to compromised accounts;

f. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g. Placing "freezes" and "alerts" with credit reporting agencies;

h. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i. Contacting financial institutions and closing or modifying financial accounts;

j. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k. Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be

cancelled; and

l. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

113. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password-protected.

114. Further, as a result of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

115. Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII and PHI. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft. Here, Defendant knew of the breach ***since May 2026***and did not notify the victims until August 27, 2026. Yet Defendant offered no explanation of purpose for the delay. This delay violates HIPAA and other notification requirements and increased the injuries to Plaintiff and Class.

## CLASS ACTION ALLEGATIONS

116. Plaintiff brings all counts, as set forth below, individually and as a Class action, pursuant to the provisions of the Fed. R. Civ. P. 23, on behalf of a Class defined as:

> All individuals residing in the United States whose Sensitive Information was compromised in the Data Breach (the "Class" or "Class Members").

117. Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

118. This proposed Class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the Class definition in an amended pleading or when he moves for Class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

119. **Numerosity – Fed. R. Civ. P. 23(a)(1)**: Plaintiff is informed and believes, and thereon alleges, that there are at minimum, over a thousand members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Indico's records, including but not limited to the files implicated in the Data Breach.

120. **Commonality – Fed. R. Civ. P. 23(a)(2):** This action involves questions of law and fact common to the Class. Such common questions include, but are not limited to:

a. Whether Indico had a duty to protect Plaintiff's and Class members' PII and PHI;

b. Whether Indico was negligent in collecting and storing Plaintiff's and Class members' PII and PHI, and breached its duties thereby;

c. Whether Indico violated its own Privacy Practices;

d. Whether Indico entered a contract implied in fact with Plaintiff and the Class;

e. Whether Indico breached that contract by failing to adequately safeguard

Plaintiff's and Class members' PII and PHI;

f. Whether Indico was unjustly enriched;

g. Whether Plaintiff and Class members are entitled to damages as a result of Indico's wrongful conduct; and

h. Whether Plaintiff and Class members are entitled to restitution as a result of Indico's wrongful conduct.

121. **Typicality – Fed. R. Civ. P. 23(a)(3)**: Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class all had information stored in Indico's system, each having their PII and PHI exposed and/or accessed by an unauthorized third party.

122. **Adequacy of Representation – Fed. R. Civ. P. 23(a)(4)**: Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex Class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

123. **Injunctive Relief, Fed. R. Civ. P. 23(b)(2):** Defendant has acted and/or refused to act on grounds that apply generally to the Class therefore making injunctive and/or declarative relief appropriate with respect to the Class under 23(b)(2).

124. **Superiority, Fed. R. Civ. P. 23(b)(3):** A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common

questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Indico. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

125. Indico has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

126. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Indico failed to timely and adequately notify the public of the Data Breach;

b. Whether Indico owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII and PHI;

c. Whether Indico's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Indico's failure to institute adequate protective security measures amounted to negligence;

e. Whether Indico failed to take commercially reasonable steps to safeguard

consumers' and patients' PII and PHI; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

127. Finally, all members of the proposed Class are readily ascertainable. Indico has access to Class members' names and addresses affected by the Data Breach. Class members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

## COUNT I

**Negligence**

(On Behalf of Plaintiff and Class Members)

128. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

129. Defendant required Plaintiff and Class Members to submit non-public personal information in the course of receiving services from Defendant's corporate customers.

130. By collecting and storing this data in Defendant's computer network and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer network—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

131. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the

Private Information.

132. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach.

133. Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the healthcare, medical, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

134. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

135. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

136. Defendant breached its duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to

safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failure to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

137. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the industry.

138. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

139. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

140. Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

141. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide

adequate credit monitoring to all Class Members.

**COUNT II**
**Breach of Implied Contract**
(On Behalf of Plaintiff and Class Members)

142. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

143. When Plaintiff and Class Members provided their Private Information to Defendant in exchange for Defendant's medical services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

144. Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

145. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

146. Plaintiff and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

147. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

148. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

149. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

150. Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

151. As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

152. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

153. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate long-term credit monitoring to all Class Members.

**COUNT III**
**Unjust Enrichment**
(On Behalf of Plaintiff and Class Members)

154. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

155. Plaintiff brings this claim individually and on behalf of all Class Members.

156. This Claim is pleaded in the alternative to Counts II above.

157. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and the Class Members.

158. As such, a portion of the payments made by or on behalf of Plaintiff and the Class

Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

159. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and/or its agents and in so doing provided Defendant with their Private Information. In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

160. Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

161. In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

162. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

163. Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

164. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

165. If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

166. Plaintiff and Class Members have no adequate remedy at law.

167. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

168. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

169. Defendant should be compelled to disgorge into a common fund or constructive

trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief as follows:

a. For an Order certifying this action as a Class action and appointing Plaintiff as a Class Representative and his counsel as Class Counsel;

b. For equitable relief enjoining Indico from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class members;

c. For equitable relief compelling Indico to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Personal Information compromised during the Data Breach;

d. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Indico's wrongful conduct;

e. Ordering Indico to pay for not less than three years of credit monitoring for Plaintiff and the Class;

f. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g. For an award of punitive damages, as allowable by law;

h. For an award of attorneys' fees and costs, and any other expense, including

expert witness fees;

i. Pre- and post-judgment interest on any amounts awarded; and,

j. Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 9, 2026

Respectfully submitted,

By: */s/ Casondra Turner*
Casondra Turner (MA BBO 687682)
**MILBERG, PLLC**
260 Peachtree Street NW, Suite 2200
Atlanta, GA 30303
Telephone: 771-772-3086
cturner@milberg.com

Marc H. Edelson*
Liberato P. Verderame*
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N300
Newtown, PA 18940
T: (215) 867-2399
medelson@edelson-law.com
lverderame@edelson-law.com

*Attorneys for Plaintiff and the Putative Class*

* *Pro hac vice forthcoming*